The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Darin R. JOHNSON, Defendant–Appellee.

No. 93SA164.

Supreme Court of Colorado,
En Banc.

Jan. 24, 1994.

A. William Ritter, Jr., Dist. Atty., Nathan B. Coats, Chief Appellate Deputy Dist. Atty., Denver, for plaintiff-appellant.

Michael G. Root, Elena J. Eisenberg, Denver, for defendant-appellee.

Justice SCOTT delivered the Opinion of the Court.

In this case, we are called upon to review the district court's order suppressing six ounces of cocaine confiscated from the luggage of the defendant as the defendant waited to board a plane bound for Ontario, California. We hold that the initial police-citizen encounter at issue here was not a seizure and that the defendant's consent to the ensuing search of his luggage was given voluntarily. We therefore reverse the district court's suppression order and remand for proceedings consistent with this opinion.

I

On November 5, 1992, while on evening narcotics assignment at Stapleton International Airport in Denver, Special Agent Robert Gregory of the Federal Drug Enforcement Administration and Detective Daniel Kimmett of the Denver Police Department noticed the defendant, Darin R. Johnson (Johnson), running down Concourse C. Apparently heading towards a departure gate, Johnson was carrying a pillowcase stuffed with clothing and a brown tweed bag. The officers continued to observe Johnson as he slowed his pace to a walk, approached the gate attendant at Gate C-18, and asked the gate attendant where he could find a public phone. After obtaining directions from the attendant, Johnson left his luggage in the waiting area and walked to a public pay phone located about fifty feet from the gate. The officers approached within a close enough distance to hear Johnson's conversation. Although the officers were unaware of whom Johnson was talking to, it was apparent to them that he was attempting to arrange for ground transportation at the conclusion of his flight. After completing the call, Johnson returned to the boarding area at Gate C-18 and entered the line which had

formed to board the aircraft for the scheduled commercial flight. While Johnson was still in line waiting to board the aircraft, both officers approached him, displayed their badges, identified themselves as law enforcement officers, and asked if they could speak with him. At the suppression hearing, Officer Gregory presented the following undisputed testimony regarding the encounter with Johnson:

> While [Johnson] was waiting in line to board the airplane, we contacted him; walked up, identified ourselves as police officers. I asked Mr. Johnson if I could talk to him. He said yes. I asked him if he was flying out. He said yes, he was. I said, "Do you have an airline ticket?" which he produced. His name was on top of the ticket, which indicated he was flying out to Ontario[, California].
>
> I then handed him his ticket back to him; asked him for a driver's license or any identification. He produced a California driver's license bearing his name; photo was indeed him. I then handed back the driver's license. Officer Kimmett asked if he was carrying any narcotics or large sums of money. He stated no. Officer Kimmett then asked if he would give consent to search his bags, and Mr. Johnson did give consent for the search.

In response to Officer Kimmett's inquiry, Johnson then handed both bags to Officer Kimmett. Kimmett searched the bags and discovered what was later determined to be six ounces of cocaine in the pocket of a pair of pants from one of the bags. Based on their preliminary identification of the substance found in the search, the officers placed Johnson under arrest and conducted a search incident to an arrest.

Johnson was eventually charged with unlawfully possessing more than 28 grams of cocaine in violation of section 18–18–405, 8B C.R.S. (1992 Supp.). He filed a motion to suppress the cocaine seized from his bag at the airport, and the district court held a hearing on the motion on June 2, 1993.

At the hearing, Johnson argued that the officers conducted an illegal investigatory stop and that the cocaine seized from his possession should be suppressed because the seizure of the cocaine was a direct result of the illegal stop. The district court agreed, finding that the prosecution "conceded" that the original stop was illegal, and holding that although Johnson's consent to the search was voluntary, it was not sufficiently attenuated from the officers' prohibited actions to remove the taint of the illegal stop. Thus, the district court granted Johnson's motion to suppress the seized cocaine.

The People subsequently filed this interlocutory appeal,[1] disputing the district court's finding that the prosecution conceded the stop was illegal and arguing that the search of Johnson's luggage was consensual in nature. A review of the record confirms that the People did not, in fact, concede that the stop was illegal. Thus, because we find that Johnson's initial encounter with the officers in question was not a seizure and Johnson's subsequent consent to a search of his bags was voluntary, we reverse the suppression order of the district court.

II

In this case we examine a police-citizen encounter and determine the legality of two separate, though related, actions in the course of that encounter on the part of law enforcement officers. The first action we must review is the officers' initial contact with Johnson including the questions asked by the officers and the officers' brief examination of Johnson's airline ticket and identification. The second action to be scrutinized involves the officers' search of Johnson's luggage and subsequent seizure of the contents, and Johnson's alleged consent to this search. As a preliminary matter, however, we will address Johnson's argument that at the suppression hearing the People conceded the illegality of the initial stop and therefore cannot now raise the issue on appeal.

A

■ The Fourth Amendment to the United States Constitution and Article II, Section 7 of the Colorado Constitution hold that the

---

1. We have jurisdiction over this appeal pursuant to § 16–12–102(2), 8A C.R.S. (1992 Supp.).

people shall be secure in their persons from "unreasonable searches and seizures." It is well-recognized that a brief, investigatory stop does not violate this "reasonableness" standard where the stop is justified by reasonable, articulable suspicion that the individual has or is engaged in criminal activity, and the scope and character of the detention is reasonably related to its purpose. *Stone v. People,* 174 Colo. 504, 508, 485 P.2d 495, 497 (1971); *accord People v. Carillo–Montes,* 796 P.2d 970, 973 (Colo.1990) (police officer may stop a person for investigatory purposes where the stop is supported by reasonable suspicion of criminal activity); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (finding reasonable articulable suspicion necessary to justify "stop and frisk" of suspect).

■ The district court ruled that the prosecution conceded the encounter between Johnson and Officers Gregory and Kimmett was an investigatory stop unjustified by the requisite "reasonable suspicion" that the defendant was involved in criminal activity. We disagree. The record of the suppression hearing makes it clear that while the prosecution did concede that the police lacked any articulable basis to suspect Johnson was involved in criminal activity and thus were acting without a reasonable suspicion to stop the defendant,[2] the prosecution did not at any time concede that the encounter was an investigatory *"Stone"* stop. On the contrary, the principal argument put forth by the prosecution at the suppression hearing was that the encounter with the defendant was not sufficiently intrusive to rise to the level of a seizure, and thus did not implicate the Fourth Amendment. Immediately after conceding that the officers lacked reasonable articulable suspicion to stop Johnson, the prosecuting attorney was asked by the district court judge whether Johnson's consent to the search of his bags overrides the initial unlawful stop. In response, the prosecutor argued that the encounter was not a "stop":

I think there was not even what can be called a stop. We know from *Pancoast,* back in '82, that not every confrontation between a citizen and a police officer arises to a Fourth Amendment type of stop or seizure.

The court disagreed, responding that "this is a stop. I don't have any quarrel with that concept." Still, the prosecutor pressed forward with his argument:

A police officer can go up to any person on the street, especially when the person is continuing to walk along or carry their luggage. And, frankly, *Pancoast* and *Florida v. Royer* and *Florida v. Rodriguez,* of the U.S. Supreme Court, specifically in the *Royer* case, when detectives approach someone in an airport, identify themselves, and ask to speak with him and then ask to see his ticket and driver's license, *this, quote, confrontation does not constitute a stop or seizure.*

(Emphasis added).

These statements indicate that the prosecution did not concede that the encounter in question was an investigatory stop. Not only does the prosecuting attorney plainly state that the confrontation here did not constitute a "stop or seizure," and cite authority for his contention, but immediately after making this argument the prosecutor submitted to the court a brief on the issue of stops in airports—certainly not the action of a party conceding that a *Stone* stop had occurred.

Despite the argument put forth by the prosecutor, it appears that the district court remained convinced that the stop was conceded. The confusion on this matter is evident from the following colloquy between defense counsel and the trial judge, which took place shortly after the prosecutor had argued that the encounter "was not even what can be called a stop":

**Defense counsel:** And I guess what I'm hearing the Court say is we're conceding that the initial contact was illegal.

**The court:** The DA's conceding that.

2. The record reveals the following exchange:
**The Court:** Very frankly, from what I've heard so far, this is not a profile stop. I mean, this does not arise to reasonably articulable suspicion. I don't think you're seriously contending that. I assume you're not.
**Prosecuting attorney:** Frankly, no. . . .

**Defense counsel:** But I'm hearing the Court say that I don't need to argue that point.

**The court:** That's right.

The court then recessed without any further substantive discussion and subsequently ruled that the search was unlawful based on the initial stop of the defendant which "it is conceded by the district attorney ... was an investigatory stop made by the officers without reasonably articulable suspicion of criminal activity."

Despite the prosecutor's failure to object to the district court's apparent mischaracterization of his position, we do not agree that the People conceded the illegality of the original encounter with the defendant. At no time during the suppression hearing did the prosecutor state or imply that the officer's encounter with the defendant was illegal. More importantly, the prosecutor clearly raised an argument completely contrary to such a concession, i.e., that the intrusiveness of the defendant's initial encounter with the officers was so slight that it did not amount to a "stop" or a "seizure" requiring reasonable suspicion and other protections fostered by our Fourth Amendment jurisprudence. Johnson contends that if the court did mischaracterize the People's position, the prosecutor was obligated to correct the court, not to sit idly by and then raise the issue on appeal. But the record reveals that the prosecutor did much more than sit idly by: in direct response to the court's inquiry as to whether consent to a search overrides an illegal stop, the prosecutor told the court that he did not believe the encounter constituted a "stop or seizure." Then, after the court summarily concluded that it was a stop, the prosecutor again explained his belief that this was the type of police-citizen encounter which did not implicate the Fourth Amendment. Simply because the court misconstrued the prosecutor's argument, and the prosecutor did not object to this misconstruction at every instance, on the record before

us the People should not now be barred from raising the issue.

■ Nor does the fact that the district court failed to address this issue bar this court from now resolving the matter. Although the district court held that the legality of the initial stop was not in question, the court still made sufficient findings of fact to allow this court to engage in meaningful appellate review. The court's oral order suppressing the seized cocaine provides a thorough recitation of the facts regarding the officers' contact with Johnson. Additionally, the record below reveals no conflicting evidence regarding the details of the officers' encounter with Johnson.[3] *See People v. Hutton,* 831 P.2d 486, 489 (Colo.1992) (remand unnecessary where appellate court could apply correct legal standard to district court's findings of fact); *People v. McIntyre,* 789 P.2d 1108 (Colo.1990) (although uncertain as to whether the trial court ruled on whether a defendant was in custody at the time he confessed, and faced with conflicting testimony on the matter, holding that the trial court's implied findings of fact were "marginally sufficient" to permit meaningful appellate review); *see also Patterson v. Cronin,* 650 P.2d 531 (Colo.1982) (reviewing court not precluded from review of issue not addressed by court below where parties raised the issue in their trial court pleadings).

■ Finally, we disagree with Johnson's contention that remand is necessary so that the parties may fully argue at the district court level the question of the legality of the officers' initial encounter with Johnson. Both parties have thoroughly addressed the issue in their briefs to this court and further argument at the trial court level would be an improvident use of limited judicial resources.

We therefore hold that the question of whether the officers' initial encounter with the defendant constituted a stop requiring reasonable suspicion of criminal activity or was merely a consensual encounter not amounting to a Fourth Amendment seizure

---

3. The only witnesses to testify at the suppression hearing were the two arresting officers, Robert Gregory and Daniel Kimmett. Defense counsel does not and cannot now contend that other witnesses would have been called had the district

court not misstated the prosecution's position, in light of the fact that the defense's decision not to call any witnesses was made *prior* to the court's statements regarding the alleged concession.

was raised below and therefore may be resolved now on appeal.

## B

■ The Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), is well-known for establishing the legality of a brief investigatory stop less intrusive than an arrest where that stop is based on reasonable, articulable suspicion proportional to the level of intrusion that the suspect is engaged in criminal activity. 392 U.S. at 16–20, 27, 30, 88 S.Ct. at 1877–79, 1883, 1884. While the stop in *Terry* involved a search for weapons, the Court subsequently made it clear that a brief stop for questioning is also permissible as long as the stop is based on reasonable suspicion of criminal activity. *United States v. Brignoni–Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). Of greater relevance here, however, is the Court's statement in *Terry* that some police-citizen encounters do not implicate Fourth Amendment concerns at all:

> [N]ot all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

*Terry*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1879.

This rather general concept of a police-citizen encounter not resulting in a seizure was explained in more detail by Justice Stewart in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), where the Court addressed the question of whether an individual who was approached and questioned by federal drug agents as she walked through an airport concourse, was unlawfully seized. Justice Stewart delivered the opinion of the Court, but in finding that the suspect was not seized when she was approached and questioned by the agents on the concourse, he was joined only by Justice Rehnquist. Although not adopted by the Court until later (as discussed below), Justice Stewart first announced the test for determining the existence of a Fourth Amendment seizure as follows:

> [A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.... In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Mendenhall*, 446 U.S. at 554–55, 100 S.Ct. at 1877 (footnote and citations omitted).[4]

Justice Stewart's standard gained clear acceptance from the majority of the Court in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), another case where narcotics investigators encountered a suspect in an airport as the suspect walked towards the boarding area for his flight. The *Royer* plurality found that Royer was seized when the officers told him that he was suspected of transporting narcotics and asked him to accompany them to the police room, while retaining his ticket and driver's license and not indicating in any way that he was free to depart. Quoting from Justice Stewart's opinion in *Mendenhall*, the Court held that "[t]hese circumstances surely amount to a show of official authority such that 'a reasonable person would have believed that he was not free to leave.'" *Roy-*

---

**4.** This standard was neither accepted nor rejected by the Court at the time. The three concurring Justices did not pass on the issue, finding instead that the encounter was a reasonable *Terry* stop. *Mendenhall*, 446 U.S. at 560, 100 S.Ct. at 1880. The dissent criticizes the plurality's failure to consider certain objective factors indicative of a seizure and concludes that a seizure did occur, but does not reject the test in general. *Id.* at 570–71, 100 S.Ct. at 1885.

*er,* 460 U.S. at 502, 103 S.Ct. at 1327.[5]

More recently, in *Florida v. Bostick,* —— U.S. ——, ——, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991) (overturning the Florida Supreme Court's adoption of a *per se* rule prohibiting the police from randomly boarding buses as a means of drug interdiction), the Court added another significant element to the definition of a Fourth Amendment seizure. In rejecting the defendant's argument that he must have been seized because no reasonable person would freely consent to a search of luggage that he knows contains drugs, the Court disagreed "because the reasonable person test presupposes an *innocent* person." *Id.* at ——, 111 S.Ct. at 2388. Without deciding whether a seizure occurred, the Court remanded that case to the Florida Courts to consider the seizure question under the correct legal standard.

Additionally, the Supreme Court has indicated that an encounter does not become a seizure if a suspect responds to an officer's request merely due to the inherent social pressure to cooperate with the police. In *INS v. Delgado,* 466 U.S. 210, 216–17, 104 S.Ct. 1758, 1762–63, 80 L.Ed.2d 247 (1984), the Court held as follows:

> *While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.* Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment. But if the person refuses to

answer and the police take additional steps ... to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure.

(Emphasis added) (citations omitted).[6]

In significant respect, Colorado case law is consistent with recent Supreme Court decisions and also recognizes the existence of "three general categories of police-citizen encounters: (1) arrest, (2) investigatory stop, and (3) consensual interview." *People v. Trujillo,* 773 P.2d 1086, 1089 (Colo. 1989) (citations omitted). The first two, the arrest and investigatory stop, implicate the protections of the Fourth Amendment and must be justified by probable cause and reasonable suspicion of criminal activity, respectively. *Id.* The third, what we termed the "consensual interview," does not implicate the protections of Article II, Section 7, of the Colorado Constitution or the Fourth Amendment of the United States Constitution. In *Trujillo,* we defined the "consensual interview" as " 'that in which no restraint of the liberty of the citizen is implicated, but the voluntary cooperation of the citizen is elicited through non-coercive questioning.' " *Id.* (citation omitted). Similarly, in *People v. Thomas,* 839 P.2d 1174 (Colo.1992), we defined a "consensual encounter" as follows:

> A consensual encounter consists of the voluntary cooperation of an individual to the non-coercive questioning by an officer. The individual is free to leave at any time during such an encounter, and, therefore, he is not "seized" within the meaning of the Fourth Amendment. The test for determining if the encounter is a consensual

**5.** In dissent, Justice Blackmun explicitly agreed with the plurality's adoption of the Fourth Amendment seizure standard proposed by Justice Stewart in *Mendenhall. Royer,* 460 U.S. at 514, 103 S.Ct. at 1333.

**6.** *See* Wayne R. LaFave, *Bill of Rights—Pinguitudinous Police,* 1991 U.Ill.L.Rev. 729, 739–40 (1991) (noting that the Supreme Court has not applied the "not free to leave" test literally since all but the most "thick-skinned" average person would not feel free to leave if approached and questioned by an officer; but that the test really amounts to an examination of "whether the police officer, even if making inquiries a private

citizen would not, has otherwise behaved in a manner which would be perceived as a inoffensive contact if it occurred between two ordinary citizens"; and finding that an encounter is a seizure "if the officer engages in conduct which a reasonable person would view as threatening or offensive even if performed by another private citizen," including such tactics as "pursuing a person who has attempted to terminate the contact by departing, calling to such person to halt, holding a person's identification papers or other property, blocking the path of the suspect, physically grabbing and moving the suspect, and encircling the suspect by many officers").

one is whether a reasonable person under the circumstances would believe he or she was free to leave and/or to disregard the official's request for information.

*Thomas*, 839 P.2d at 1177–78 (citations omitted).[7]

Viewing the totality of the circumstances surrounding the officers' initial encounter with Johnson, we are convinced that Johnson was not subjected to a Fourth Amendment seizure. First, the officers approached Johnson as he was standing in line and did not attempt to detain him or otherwise prevent him from continuing to move along in line as they talked to him. Second, speaking in a conversational tone, the officers asked rather than demanded to examine Johnson's ticket and identification. Third, the officers were not in uniform and did not display any weapons. Fourth, the entire encounter lasted for only two to three minutes. Thus, neither the officers' statements nor their conduct indicated that they exerted control or authority over Johnson. Leaving aside the inherent pressure felt by any citizen to cooperate with a law enforcement officer, the circumstances of this encounter do not appear "so intimidating as to demonstrate that a reasonable, innocent person would have believed he was not free to leave if he had not responded." *Delgado*, 466 U.S. at 217, 104 S.Ct. at 1763.

Although the district court held that the initial stop was unlawful, its ruling on the ensuing search of Johnson's bag actually embraces the entire encounter and supports our holding that this was a consensual encounter.[8] The district court held as follows:

> There isn't any question of attenuation here. This consent to search followed immediately upon the conversation with the officers. And yet the consent itself appears to be and the Court finds is wholly and totally voluntary. There was no coercion of any kind involved. There were no promises, no threats. This was a conversation taking place in broad view of the other people around.... So the consent to search appears to be and the Court finds that it is wholly and totally voluntary; nonetheless, it is the unattenuated product of an unlawful stop.

The initial encounter in this case is quite similar to the police-citizen encounter in *Royer*, which was found by the Supreme Court to be permissible. In *Royer*, 460 U.S. at 493–94, 103 S.Ct. at 1321–22, the defendant was first contacted by two officers as he made his way to the concourse which led to the airline boarding area. The officers approached Royer, identified themselves as policemen working out of the sheriff's office, and asked if Royer had a moment to speak with them. Royer said "yes." The officers then asked if they could see Royer's ticket and driver's license and Royer provided the requested documents. The Court did not view this initial confrontation as a seizure, finding that "[a]sking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves," but found that the

---

**7.** Neither *Thomas* nor *Trujillo* is dispositive here. In *Thomas*, we held that a police-citizen encounter occurring after the citizen's automobile was stopped for having a temporary sticker that appeared to be altered was consensual because the officer informed the defendant he was free to go and the defendant conceded that he knew this in his testimony. *Thomas*, 839 P.2d at 1178. In *Trujillo*, we held that a seizure occurred where three police cars approached the suspects and blocked their path, shining the vehicles' headlights in their eyes. *Trujillo*, 773 P.2d at 1090. With regard to airport searches, we have previously addressed warrantless searches not justified by probable cause or reasonable suspicion only in the context of a regulatory search pursuant to a statutory or administrative program. *See People v. Heimel*, 812 P.2d 1177, 1182 (Colo. 1991) (recognizing that the warrant exception for regulatory searches calculated to further a manifestly important governmental interest applies to the airport screening process whereby passengers pass through a metal detector and can be subjected to a physical search of carry-on baggage prior to entering the pre-boarding area).

**8.** Though termed a "consensual encounter," the actions of the police may precede the actual manifestation of consent by the suspect, however, both are important in determining whether a seizure has occurred. Here, because the officers approached in a non-threatening, respectful manner, the initial encounter, prior to the suspect's acquiescence to the questioning, was not a seizure. *See* 3 Wayne R. LaFave, Search and Seizure, A Treatise on the Fourth Amendment § 9.2(h), at 408 (2d ed. 1987) ("it does not appear ... that the *Mendenhall–Royer* test is intended to divide police-citizen encounters into their seizure and non-seizure categories by reliance upon the amorphous concept of consent").

officers' *subsequent* actions including asking Royer "to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart ... converted the lawful encounter into a seizure." *Id.* at 501, 103 S.Ct. at 1326;[9] *see Delgado,* 466 U.S. at 216, 104 S.Ct. at 1762–63 (1983) ("our recent decision in *Royer* plainly implies that interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure") (citation omitted); *see also Florida v. Bostick,* —— U.S. ——, —— 111 S.Ct. 2382, 2388 (holding "no seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage");[10] *Florida v. Rodriguez,* 469 U.S. 1, 4–6, 105 S.Ct. 308, 310–11, 83 L.Ed.2d 165 (1984) (per curiam) (holding that no seizure took place where two officers approached a suspect in an airport, the suspect unsuccessfully attempted to move away, and an officer showed his badge and asked if they might talk; "The initial contact between the officers and respondent, where they simply asked if he would step aside and talk with them, was clearly the sort of consensual encounter that implicates no Fourth Amendment interest.").

Johnson turns to the First Circuit's decision in *United States v. Berryman,* 717 F.2d 651 (1st Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 125 (1984), to support his contention that the officers in this case exceeded the bounds of a consensual encounter when the questioning continued even after Johnson had provided the officers with his ticket and appropriate identification. In *Berryman,* the court held that "a reasonable person would not feel free to walk away when, after answering truthfully where he had been and for how long, and proffering his airline ticket whose information is con-

firmed by other identification, he is questioned further and confronted with the suspicion of drug trafficking." 717 F.2d at 656.

We agree that prolonged questioning by the police after a citizen has provided proper identification and has answered questions in a manner giving rise to no additional suspicion militates in favor of a finding that the citizen was seized. But like the other factors which we have mentioned, this fact is not dispositive of the issue and must be viewed in conjunction with all other circumstances relevant to the encounter. In the instant case, the officers asked Johnson a total of six questions: they asked if they could talk to him; whether he was flying out; whether he had a ticket; whether he had a driver's license; whether he was carrying narcotics or large sums of money; and whether he would give consent to a search of his bags. The entire encounter lasted only two to three minutes and Johnson at no time indicated that he wished to stop speaking to the officers. We do not believe this is the type of prolonged questioning the Supreme Court was concerned with when it stated that "a search that is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry,* 392 U.S. at 18, 88 S.Ct. at 1878, *quoted in Berryman,* 717 F.2d at 656. Furthermore, unlike *Berryman* where the officers positioned themselves in front and in back of the suspect, thereby blocking his movement as they questioned him, 717 F.2d at 656, the officers in the instant case in no way hindered Johnson's motion through the line.

The Tenth Circuit Court of Appeals addressed a factual scenario much like the instant case in *United States v. Bell,* 892 F.2d 959 (10th Cir.1989), *cert. denied,* 496 U.S. 925, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1990). In *Bell,* that court found the search of a

9. While the Court's opinion consists of only a plurality, at least three of the dissenters agree that the initial encounter in *Royer* was not a seizure. *Royer,* 460 U.S. at 523 n. 3, 103 S.Ct. at 1337 n. 3 (dissenting opinion) (agreeing with the "plurality's intimation that when the detectives first approached and questioned Royer, no seizure occurred and thus the constitutional safeguards of the Fourth Amendment were not invoked").

10. Although we accept the legal standards utilized by the Supreme Court in *Bostick* and *Delgado,* we emphasize that our holding today is confined to the specific facts of the instant case and does not extend to other types of police-citizen encounters held not to be seizures by the Supreme Court.

defendant's ticket, bag, and jacket to be consensual, even though the officers continued their inquiry after the suspect provided his airline ticket and proper identification. The court found no Fourth Amendment violation based on the following facts:

> Officers Palmer and Whittaker did not summon Ziebarth to their presence, but rather approached him. They requested, but did not demand to see, Ziebarth's ticket and identification. After verifying the name on the ticket and identifying himself as a narcotics officer, Palmer asked Ziebarth's permission to look through his bag. He advised Ziebarth of his right to refuse consent. Ziebarth handed the bag to Palmer who, after finding nothing, returned it. When Ziebarth was asked about the zippered pockets on his jacket, he reached up himself, unzipped the pockets and handed Palmer the envelope which he said contained about $3,000.

*Id.* at 966. The only clear difference between *Bell* and the instant case is that in *Bell* the officers notified the defendant of his right to refuse consent. This notification occurred, however, in conjunction with the request to search Bell's bag, not with the initial stop and questioning of the defendant. Thus, it does not serve to distinguish the initial stop in *Bell* from that in the instant case.

In summary, viewing the totality of the circumstances present in the instant case, we believe that a reasonable innocent person in Johnson's situation would have felt free to decline to speak to the officers or to terminate the conversation. The officers did nothing to restrain Johnson's liberty and did not convey the message that compliance was required. Johnson was not physically or otherwise restrained nor was his movement restricted; his ticket and identification were not withheld; there were no threatening statements or gestures; no weapons were revealed; and the entire encounter lasted for two to three minutes.[11]

### C

■ Having held that the initial stop of the defendant was lawful, we must now decide whether the defendant's ensuing consent to the officers' search of his bags was voluntary. *See People v. Brewer,* 690 P.2d 860, 864 (Colo.1984) (where defendants voluntarily consent to search, there can be no Fourth Amendment violation); *People v. Thiret,* 685 P.2d 193, 201 (Colo.1984) (consent is voluntary where it is "not the result of duress or coercion, express or implied or any other form of undue influence"). We see no reason to disturb the finding of the district court that "the consent itself appears to be and the Court finds is wholly and totally voluntary. There were no promises, no threats." There is no evidence that the encounter became intrusive or threatening when the officers asked Johnson if they could search his luggage. Officer Gregory testified that "Officer Kimmett asked if [Johnson] would give consent to search his bags, and Mr. Johnson did give consent for the search." Johnson then "handed both bags to Officer Kimmett," they were not seized from Johnson's possession; and on his own initiative, Johnson stepped "one foot" out of the line of passengers boarding the plane. Officer Gregory also testified that at the time Johnson's bag was searched, the rest of the passengers who had been in line with Johnson had boarded the plane. However, the fact remains that the officers did not ask that Johnson step out of line or remain with them as they searched his bags; Johnson's actions were entirely voluntary. Thus, we see no reason to overturn the district court's determination that Johnson's consent to the search of his luggage was voluntary.

### III

In conclusion, we hold that the People are not barred from raising on appeal the argument which they raised below, which was that the initial encounter between the officers and the defendant was not a stop or seizure and thus did not implicate the Fourth Amendment or Article II Section 7 of the Colorado Constitution. And finding that the initial encounter did not constitute a seizure and that the subsequent search of the defendant's bags was consensual in nature, we therefore reverse the trial court ruling and

11. We emphasize that our holding is based on    our finding that no seizure took place here.

remand for further proceedings in conformity with this opinion.

ERICKSON, J., specially concurs.

VOLLACK, J., joins in the special concurrence.

Justice ERICKSON specially concurring:

In my view, the Fourth Amendment of the United States Constitution was not implicated in this case because there was no investigatory stop. Under the facts in this case, the only issue is whether the search was made with the consent of the defendant. The trial court found that Johnson voluntarily consented to the search of the contents of the pillowcase and his brown tweed bag. The police discovered cocaine in the pillowcase, seized the contraband, and arrested Johnson for possession of cocaine. The trial court erred in concluding that there was an investigatory stop and in suppressing the cocaine.

Encounters between citizens and law enforcement officers are divided into three categories: consensual questioning, investigatory stops, and arrests. *United States v. Evans*, 937 F.2d 1534 (10th Cir.1991); *People v. Thomas*, 839 P.2d 1174 (Colo.1992); *People v. Trujillo*, 773 P.2d 1086 (Colo.1989). Only the last two types of encounters are "seizures" within the meaning of the Fourth Amendment. Articulable suspicion of illegal conduct is required for an investigatory stop, and probable cause is required before an arrest can be made.[1] *Thomas*, 839 P.2d at 1177. Unless or until the encounter loses its consensual nature, or so long as a reasonable person would feel free to disregard the request of the police officer and go about his business, no seizure has occurred. In this case, the police officer was not required to have a reasonable or articulable suspicion in order to question Johnson. *Florida v. Bostick*, —— U.S. ——, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991); *Thomas*, 839 P.2d at 1177–78.

In determining whether a particular encounter constitutes a seizure, a court must consider all of the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that he was not free to decline the officers' requests or otherwise terminate the encounter. *Bostick*, —— U.S. at ——, 111 S.Ct. at 2389. From the sizeable body of law that exists about police-citizen encounters in airports, busses, and city streets, *see generally* 3 Wayne R. LaFave *Search and Seizure* § 9.2(h) (2d ed. 1987), it is clear that none of the police actions in this case are of a kind that would constitute a seizure. The Fourth Amendment is not implicated merely because police officers approach a person in a public place and make inquiries which may or may not be answered. *Trujillo*, 773 P.2d at 1089. When a police officer shows his badge to a person and identifies himself as a police officer, he has not seized that individual. *See, e.g., United States v. McKines*, 933 F.2d 1412 (8th Cir. 1991). Similarly, when an individual gives his consent to a police officer to examine his identification documents and air lines tickets, or to search his luggage, the police officer has not seized that individual. *Bostick*, —— U.S. at ——, 111 S.Ct. at 2386; *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Evans*, 937 F.2d at 1537.

In the instant case, the prosecution never contended that the officers had reasonable or articulable suspicion to justify an investigatory stop. Instead, the prosecution asserted that the encounter between the officers and Johnson did not initially amount to a stop or seizure under the Fourth Amendment. The prosecution maintained that reasonable suspicion was not required, and that the legality of the search should turn entirely upon the voluntariness of Johnson's consent to the search. *Florida v. Rodriguez*, 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984); *Royer*, 460 U.S. at 491, 103 S.Ct. at 1319; *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *People v. Pancoast*, 659 P.2d 1348 (Colo.1982). In my view, the prosecution was correct and neither *Stone v. People*, 174 Colo. 504, 485 P.2d 495

---

1. In the absence of a clear statement that a suppression is grounded on the Colorado Constitution, we presume a trial court relied on federal constitutional law in reaching its decision. *People v. McKinstrey*, 852 P.2d 467, 469 (Colo.1993).

(1971) (police officer may stop a person for investigatory purposes where the stop is supported by reasonable suspicion of criminal activity), nor *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (reasonable articulable suspicion is necessary to "stop and frisk" a suspect), are applicable to the facts of this case. Neither the reasonable suspicion, nor the drug-courier profile cases are on point.

The trial court erroneously concluded that because the prosecution admitted that there was no reasonable or articulable suspicion, the prosecution conceded that the encounter amounted to an illegal stop. The record contains evidence that the prosecution contested the existence of *any* stop. The trial court did not address the law governing investigatory stops or make factual findings that would permit appellate review of its conclusion that a stop occurred. *See People v. McIntyre,* 789 P.2d 1108, 1110 (Colo.1990); *People v. Johnson,* 671 P.2d 958, 962 (Colo. 1983). As a matter of law, however, the trial court's findings support the conclusion that Johnson was never stopped until the drugs were found and an arrest was made. *See People v. Hutton,* 831 P.2d 486, 489 (stating that a remand is unnecessary where the appellate court could apply correct legal standards to the trial court's findings of fact and conclude that a statement is voluntary).

The testimony in the instant case is uncontradicted and indicates that the Drug Enforcement Agents did nothing to restrain Johnson's liberty or to suggest that compliance with their requests was required. Johnson was already stopped and waiting in a boarding line when the officers approached him. The agents continued to move along with him as the line moved until he gave permission to search his bags, at which point he stepped out of line and handed the pillowcase and the brown tweed bag to Officer Kimmett, who searched the bags on the spot. Johnson was not moved. His ticket and his identification were examined and returned to him. There was no show of force or display of weapons. In fact, the entire encounter lasted only two to three minutes.

The trial court concluded that there was no articulable suspicion to support an investigatory stop and that sufficient attenuation did not exist to permit lawful seizure of the cocaine. The trial court's suppression order is based on the mistaken conclusion that a reasonable and articulable suspicion was necessary to permit the drug agents to question Johnson. As a matter of law, there was no investigatory stop. Johnson's consent to the search eliminated the need for reasonable and articulable suspicion.

Accordingly, I would reverse the trial court's suppression order and remand for further proceedings.

VOLLACK, J., joins in this special concurrence.